(No. 2501—

John Schoenig, Claimant, *vs.* State of Illinois, Respondent.

*Opinion filed June 24, 1941.*

Brown, Hay & Stephens, for claimant.

George F. Barrett, Attorney General; Glenn A. Trevor, Assistant Attorney General, for respondent.

*Per Curiam*

The complaint in this case alleges that on October 14, 1930, John R. Cranor was general superintendent of the Illi-

nois State Reformatory at Pontiac, Illinois, and the official of the State charged with the employment of teachers and other workers at this reformatory. That on or about that date, as General Superintendent, he requested the business manager of Local Union No. 122 of the International Brotherhood of Blacksmiths, Drop Forgers and Helpers to furnish him with a member of the Union who could teach the trade of blacksmithing to the inmates of the reformatory, and agreed to pay such an individual the sum of One Hundred Seventy-five Dollars per month, and in addition thereto to furnish him with his maintenance, then valued at Twenty-five Dollars per month. That pursuant to that request, the Union Business Agent sent the claimant John Schoenig to Cranor as an applicant for the job and he was employed as a teacher of the trade of blacksmithing at the Pontiac Reformatory, otherwise known as Illinois State Reformatory, at the compensation above mentioned. The claimant commenced work on about October 15, 1930, and continued to occupy such position until September 5, 1933, and at all times performed all tasks assigned to him, and his work met with the approval of the General Superintendent and other officials of the Illinois State Reformatory. When the claimant took the position he had an understanding that he would do so only for the consideration of the agreed compensation and only on condition the hours and conditions of labor in that position should be subject to the rules and regulations then laid down by the Union, and that was agreed to by the General Superintendent, Cranor, but, notwithstanding, the agreement, from the date claimant commenced work until May 1, 1931, claimant was only paid one hundred fifty dollars per month instead of one hundred seventy-five dollars per month agreed upon. On this account, he objected to the General Superintendent and Superintendent Cranor to each objection stated he expected to pay the said $175.00 per month, but they had not been able to get that through the necessary appropriation, but convinced the claimant that he would have the necessary appropriation through subsequently and then would pay to claimant the additional $25.00 per month for each month claimant was employed. Claimant made frequent requests for this additional sum of $25.00 per month, which represented the difference in the salary of $175.00 per month agreed upon and the salary of $150.00 per month paid during the period from October 15th,

1930 to May 1, 1931; and that amount never has been paid to claimant, and it is charged the State in equity and good conscience is obligated to pay this amount, which totals the sum of $162.50, to the claimant.

It is further charged that May 5, 1931, claimant was notified by the Superintendent that effective May, 1931, his salary would be increased to $175.00 per month, and this sum was paid to claimant from that time until January 1, 1933.

When claimant commenced work, on or about October 15, 1930, and for some time subsequent thereto, he lived at the Reformatory, and his room and board were furnished free of charge to him, but prior to March 1, 1931, claimant found it impossible for him to reside in the Reformatory any longer and with the consent and approval of Superintendent Cranor moved to a residence in the city of Pontiac, located outside of the Reformatory, and pursuant to the agreement made when he was employed, claimant became entitled to the agreed reimbursement of $25.00 per month.

It is also charged that after January 1, 1933, claimant was notified that his salary would be cut from $175.00 to $157.50, effective January 1, 1933, and claimant was paid the sum of $157.50 per month from February 1st, 1933 until September 3, 1933, but the agreed sum of $25.00 for maintenance was never paid to claimant, although often requested by him, and it is charged that in equity and good conscience the State of Illinois is obligated to pay claimant the sum of $775.00, representing the maintenance reimbursement to him from the period of March 1st, 1931 until September 5, 1933, at the rate of $25.00 per month.

It is also charged that under the Union rules and regulations, which were the conditions of employment agreed upon by claimant and the said General Superintendent Cranor, when claimant started to work, an employee could not be discharged without giving such employee thirty days notice in writing and that in opposition to these rules and regulations so agreed upon, claimant was discharged on September 5, 1933 without the thirty days notice, and by reason therefor the State became obligated in equity and good conscience to pay to claimant the sum of $118.11, representing salary which claimant would have earned during the remainder of September had the notice of discharge been given as agreed upon. This averment is in Paragraph 9 of the complaint.

It is also charged, in Paragraph 10 of the complaint, that the Union rules and regulations, which were the conditions of employment agreed upon by claimant and Superintendent Cranor, when claimant started to work, he was entitled each year to a vacation of two weeks with pay, but in 1933 the officials of the Reformatory refused to allow claimant to take said vacation and by reason thereof the State of Illinois became obligated in equity and good conscience to pay claimant the sum of $78.75, representing the salary to claimant for two weeks work.

Under Paragraph 11, it is further charged that under said Union rules and regulations, which were the conditions of employment agreed upon by claimant and Superintendent Cranor, when claimant started to work, claimant was to work only 44 hours a week, and additional compensation was to be paid for all additional work which should be required from him at the regular rate per hour at which claimant was then employed, namely, the rate of $1.19 per hour; that during the reconstruction of the power house claimant was required and did work 114 hours in addition to his regular hours of labor for which he was entitled, under the agreement, to compensation at the rate of $1.19 per hour, that is, to total compensation in the sum of $135.66; and that on the fence job for the Governor's Mansion, the claimant worked 48 hours in addition to his regular hours of labor; that on the fence job for the Chicago Eye and Ear Institution he worked 112 hours in addition to his regular hours of labor; on the shop lay-out job 60 hours in addition to his regular hours, and on other work 80 hours in addition to his regular hours, making a total of 298 hours in addition to his regular hours of labor on jobs other than reconstruction of the power house previously referred to, for which 298 hours claimant was entitled to compensation at the rate of $1.19 an hour, or a total of $354.62, and although claimant has often requested the officials of the Reformatory for payment of said sums to him for said overtime work, claimant has been refused, wherefore, in equity and good conscience the State of Illinois is obligated to pay claimant said sum of $135.66 and the further sum of $354.62 for said overtime work, and for failure to pay these various obligations claimant says that the State of Illinois owes him the total sum of $1,624.64.

This court has repeatedly held that before a claimant can have an award against the State he must show that he comes within the provisions of some law making the State liable to him for the amount claimed. If he cannot point to some law giving him a right to an award he cannot invoke the principles of equity and good conscience to secure the award.

In other words, an award will not be made merely on the basis of equity and good conscience.

*Crabtree* vs. *State,* 7 C. C. R. 207.

and numerous other cases as cited by this court.

The provisions of Paragraph 4 of Section 6 of the Court of Claims with reference to equity and good conscience merely define the jurisdiction of the court and does not create a new liability against the State nor increase or enlarge any existing liability, and limits the jurisdiction of the court to claims under which the State would be liable in law or equity if suable.

*Crabtree* vs. *State,* Supra.

We have also held that where there was no legal liability equity cannot create one.

*Watkins* vs. *State,* 6 C. C. R. 172.

*Crabtree* vs. *State,* Supra.

Claimant does not point out under what authority he was first appointed. It was then a part of our statutory law that the Governor should, by and with advice and consent of the Senate, within 30 days after the Act shall become effective, appoint three persons as Civil Service Commissioners to hold office for the terms of two, four and six years respectively, from the first day of March, 1905, and until their respective successors are appointed and qualified, and they shall constitute the Civil Service Commission.

See Chapter 126, Par. 1, State Civil Service, Cahill's Revised Statutes, 1929.

Subsequent provisions of this statute make it the duty of the Commissioners to classify all the offices and places of employment in the State service except as provided in Section 11. This classification shall include all offices and places of employment then in existence or which might hereafter be created in the State service.

From an examination of Section 11, it makes no reference to the position that claimant held. We have not been referred to any statute authorizing claimant's appointment.

Statutes delegating powers to public officers must be strictly construed and all parties interested must look to the statute for the grant of power.

*Diederich* vs. *Rose, et al.,* 228 Ill. 610.

Courts cannot make contracts for the parties and where the meaning is plain another meaning cannot be added by implication or intendment. This rule has been extended so far that our Supreme Court has held that equity will not give relief to one who, under a mistaken belief as to the title of the property places permanent improvements thereon.

*Williams* vs. *Van der Bilt,* 145 Ill. 238.

And there can be no recovery by claimant who was a voluntary worker although the services were performed for a department of the State.

*Sterrett* vs. *State,* 5 C. C. R. 172.

In the case of Green & Sons, a corporation, 9 C. C. R. 218, this court held that there can be no recovery of an amount fixed in express contract for services rendered thereunder where the said contract is prohibited by law and a subsequent action will not lie to recover on quantum meruit for reasonable value of said services rendered under said contract on an implied contract to pay for same as no contract will be implied where an express contract is forbidden, and an award based on such claim will be denied.

In *Dement, et al.* vs. *Rokker, et al.,* 126 Ill. 174, on page 199 of the opinion it is stated:

"The State is never estopped as an individual or private corporation may be on the ground that the agents acting under an apparent authority which is not real—the conclusive presumption that his powers are known rendering such a consequence impossible."

Every person is presumed to know the nature and extent of the powers of municipal officers and therefore cannot be deemed to have been deceived or mislead by acts done without legal authority.

*Seegar* vs. *Mueller, et al.,* 133 Ill. 86 (95).

It is a familiar principle of law that all persons who deal with municipalities and subordinate boards and agencies of the State and National government must at their peril inquire into the power of the officers or agents of such municipalities, boards or agencies to make the contract contemplated for acts of such officers can only bind in the manner and to the extent of authorized authority.

See Donnelly "Law of Public Contract," Chap. 5, p. 206.

We do not question the intent of the Superintendent of the Pontiac Reformatory, but claimant must have known, at least the law presumes that he knew that the superintendent could not fix salaries or make appropriations or assume the powers given by law to the legislature, or do other things unless authorized by statute. It is quite probable that the Superintendent of the Reformatory did do all that he could do under the circumstances to secure an appropriation along the lines contended by claimant, and it is not a sufficient answer to this to say that the claimant acted in good faith and performed the services set forth in the complaint, and we must hold that claimant knew that the superintendent had no power to fix claimant's salary or compensation in the manner set forth in the complaint.

These acts went on for a considerable period of time and it appears that the alleged promises made by the superintendent were broken the very first month that claimant worked.

It is averred in the complaint that claimant commenced work on or about October 15, 1930 and continued to occupy such position until September 5, 1933, approximately 35 months. It is charged that he was promised the sum of $175.00 per month, but from the time he commenced work until May 1st the following year, he only received $150.00 per month, and it is charged that he remonstrated with Superintendent Cranor several times, as also charged that to each objection the General Superintendent stated that he expected to pay $175.00 per month but that he had not been able to get through the necessary appropriation and said he would have the necessary appropriation through subsequently and then pay claimant the additional $25.00 per month.

The claimant then knew that the superintendent could not get the appropriation through and he must have known that the legislature is the only power in this State that can make appropriations and the amount of the appropriation is discretionary with the legislature.

Mr. Cranor testified he had been General Superintendent at the Illinois State Reformatory at Pontiac from January 13, 1930 to February 10, 1932. He remembered the claimant and said that he remembered that Mr. Schoenig and he had discussed this extra work several times. He said "I told him

repeatedly that it was necessary for the State to offer him a lower salary than he would ordinarily be entitled to at his trade on the outside, that it was necessary for him to make a sacrifice if he cared to stay with the Institution and that it was not always possible for the Institution to pay as much as the work was really worth due to the limited budget. I promised to use my influence with the proper authorities with a view to having his salary increased and if possible a special compensation for the extra fine work and some of the extra hours which he put in on these two major projects.''

Section 19 of Article IV of the Illinois Constitution of 1870 provides that the General Assembly shall never grant or authorize extra compensation, fee or allowance to any public officer, agent, servant or contractor after service has been rendered or a contract made, nor authorize the payment of any claim, or part thereof, hereafter created against the State under any agreement or contract made without express authority of law, and all such unauthorized agreements or contracts shall be null and void.

The Statute also provides that amounts paid from appropriations for personal service of any officer or employee of the State, either temporary or regular, shall be construed as full payment for all services rendered between the dates specified in the payroll and other voucher and no additional sum shall be paid to such officer or employee from any lump sum appropriation, appropriation for extra help or other purpose, or any accumulated balances in specific appropriations, which payments would constitute in fact an additional payment for work already performed and for which remuneration had already been made.

Chap. 127b, Par. 9, Cahill's Revised Statutes 1929.

In *Broderic* vs. *State*, 9 C. C. R. 458, this court held that the statute on State Finances providing among other things that amounts paid from appropriations for personal service of any officer or employee of the State, either temporary or regular, shall be considered as full payment for all services rendered between the date specified in the payroll or other voucher, and no additional sum shall be paid to such officer or employee from any lump sum or other appropriation is a direct limitation on the right of claimant to salary where such claimant received and accepted regular salary warrants for

such services during the term of employment for the amount appropriated therefor.

It has been held by this court on numerous occasions that the doctrine of "respondeat superior" does not apply to the State, and it is not liable for damages for the nonfeasance, misfeasance or malfeasance of its officers or agents.

For the reasons stated the claim will be denied.